FILED

2022 Jun-14  PM 03:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

DOUGLAS C. MARTINSON, II, as    }
administrator of the estate of    }
Christopher Bishop,    }
     }
     Plaintiff,    }    Case No.: 5:21-cv-01144-MHH
     }
v.    }
     }
SOUTHERN HEALTH    }
PARTNERS, INC., et al.,   

     Defendants.

## MEMORANDUM OPINION

Douglas C. Martinson, II, the administrator of the estate of Christopher Bishop, filed this lawsuit after Mr. Bishop died while he was in the custody of the Madison County Jail. (Doc. 17-1, p. 1, ¶¶ 1–2). The defendants are Southern Health Partners, Inc., a corporation which provides medical care for inmates at the Madison County Jail; several SHP nurses, sued in their individual capacities; and several corrections officers, sued in their individual capacities. (Doc. 17-1, pp. 1–3, ¶¶ 3–19). Mr. Martinson alleges that the defendants failed to provide basic medical care to Mr. Bishop, and the alleged failure purportedly caused Mr. Bishop's death. (Doc. 17-1, p. 1, ¶ 1). Mr. Martinson asserts against the nurses and the corrections officers a federal claim under the Fourteenth Amendment for deliberate indifference to

serious medical needs, and he asserts against SHP and the nurses a wrongful death claim under Alabama law based on those defendants' alleged medical negligence. (Doc. 17-1, pp. 8–9).

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the nurses and SHP have filed a motion to dismiss Mr. Martinson's amended complaint. (Doc. 27).[1]  This opinion resolves the motion to dismiss.  The opinion begins with a discussion of the standard that a district court uses to evaluate a Rule 12(b)(6) motion to dismiss.  Then, consistent with that standard, the Court identifies the factual allegations in Mr. Martinson's complaint, describing them in the light most favorable to Mr. Martinson.  Finally, the Court evaluates Mr. Martinson's factual allegations under the legal standards that govern the defendants' arguments for dismissal.

## I.

Rule 12(b)(6) allows a defendant to move to dismiss claims within a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint against the "liberal pleading standards set forth by Rule 8(a)(2)." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Pursuant to Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is

---

[1] The corrections officers have answered the amended complaint.  (Doc. 29).

entitled to relief." FED. R. CIV. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Twombly*, 550 U.S. at 555). In deciding a Rule 12(b)(6) motion to dismiss, a court must view the factual allegations in a complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). A court must accept well-pleaded facts as true. *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting *GSW, Inc. v. Long Cty.*, 999 F.2d 1508, 1510 (11th Cir. 1993)).

## II.

During the afternoon of August 21, 2019, Christopher Bishop ingested a large amount of methamphetamine. (Doc. 17-1, p. 4, ¶ 22). Shortly afterwards, he was arrested. (Doc. 17-1, p. 3, ¶ 21). During intake at the Madison County Jail, Mr. Bishop disclosed to the corrections officer processing him that he recently had ingested a large amount of methamphetamine. (Doc. 17-1, p. 4, ¶ 23). The intake officer circled "yes" in response to an intake form question regarding "recent

ingestion of 'dangerous levels of drugs and/or alcohol.'" (Doc. 17-1, p. 4, ¶ 23) (quoting intake form).

Intake nurse Sara Connell, an LPN, received the intake form. (Doc. 17-1, p. 4, ¶ 24). When Mr. Bishop saw Nurse Connell at 8:00 p.m. that evening, he told her that he had used a dangerously large quantity of methamphetamine earlier in the day. (Doc. 17-1, p. 4, ¶ 25). Ms. Connell did not send Mr. Bishop to the hospital or take other action. (Doc. 17-1, p. 4, ¶ 27).

At approximately 2 a.m. on the morning of August 22, 2019, Mr. Bishop was seen by another nurse, Sonya Moore. (Doc. 17-1, p. 4, ¶ 28). Ms. Moore learned from Mr. Bishop and from his records that he had recently ingested a dangerously large amount of methamphetamine. (Doc. 17-1, pp. 4–5, ¶ 29). Ms. Moore also observed that Mr. Bishop was exhibiting signs and symptoms of an overdose: he was "having difficulty breathing, had a rapid heart and respiration rate, was not steady on his feet, had slurred speech, was confused, was extremely drowsy, and was so slow to respond to questions and stimuli that he appeared to be on the verge of losing consciousness." (Doc. 17-1, p. 5, ¶¶ 30–31). Ms. Moore did not send Mr. Bishop to the hospital or take other action. (Doc. 17-1, p. 5, ¶ 33).

A few hours later, at 7:30 a.m., Mr. Bishop saw another nurse, Nioca Manley. (Doc. 17-1, p. 5, ¶ 34). Ms. Manley learned from Mr. Bishop's records that he had ingested a dangerously large amount of methamphetamine, and she observed that

Mr. Bishop was exhibiting signs and symptoms of an overdose because he was not responsive.  (Doc. 17-1, pp. 5–6, ¶¶ 35–37).  Ms. Manley was not able to get Mr. Bishop to respond.  (Doc. 17-1, p. 6, ¶ 38).  Ms. Manley treated Mr. Bishop's inability to respond as a refusal of medical treatment.  (Doc. 17-1, p. 6, ¶ 39).  Ms. Manley did not take Mr. Bishop's vital signs, did not send Mr. Bishop to the hospital, and did not take other action.  (Doc. 17-1, p. 6, ¶¶ 40, 42).

Over the course of the day, other nursing staff members—Crystal Cottrell, Tayana Millwood, Kyna Speak, and Dustin Vickers—learned of Mr. Bishop's ingestion of a dangerously large amount of methamphetamine and lack of responsiveness through Ms. Manley and other correctional staff.  (Doc. 17-1, p. 6, ¶ 43).  Those defendants did not send Mr. Bishop to the hospital or take other action. (Doc. 17-1, p. 7, ¶ 45).

Mr. Bishop was found dead in his cell the afternoon of August 22, 2019, having drowned in his own vomit.  (Doc. 17-1, pp. 7–8, ¶¶ 50–51).  Had one of the correctional officers or nurses sent Mr. Bishop to the hospital, he could have received treatment for his overdose.  (Doc. 17-1, p. 8, ¶ 53).

Mr. Martinson alleges that the nurse defendants "were aware, from their training and experience as correctional nurses, that, due to the risk of death, a person who has ingested a large quantity of meth requires evaluation and treatment at a hospital even without accompanying signs and symptoms."  (Doc. 17-1, pp. 4–7, ¶¶

26, 32, 41, 44). Mr. Bishop's arrest and death occurred within approximately 24-hours.

### III.

*Deliberate indifference to serious medical needs*

The Eighth Amendment forbids cruel and unusual punishment and prohibits "deliberate indifference to serious medical needs of prisoners." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)). The Fourteenth Amendment extends the same protection to pretrial detainees. *Dang ex rel. Dang v. Sheriff, Seminole Cty.*, 871 F.3d 1272, 1279 (11th Cir. 2017) (citing *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009); *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)). The standard that governs a deliberate indifference claim under the Fourteenth Amendment is "identical" to the standard under the Eighth Amendment. *Patel v. Lanier Cty.*, 969 F.3d 1173, 1188 (11th Cir. 2020) (quoting *Goebert*, 510 F.3d at 1326).

To establish deliberate indifference, a plaintiff must show an "objectively serious medical need," which is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and "one that, if left unattended, poses a substantial risk of serious harm." *Hoffer*, 973 F.3d at 1270 (quoting *Farrow*

*v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).  A plaintiff also must demonstrate that prison officials acted with deliberate indifference to that serious medical need. *Hoffer*, 973 F.3d at 1270 (quoting *Harper v. Lawrence Cty.*, 592 F.3d 1227, 1234 (11th Cir. 2010)).  A prison official acted with deliberate indifference if he "(1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence." *Hoffer*, 973 F.3d at 1270 (quoting *Harper*, 592 F.3d at 1234).

The deliberate indifference standard is not a negligence standard; it aligns more closely with the recklessness standard used in criminal law.  *Hoffer*, 973 F.3d at 1271 (citing *Swain v. Junior*, 961 F.3d 1276, 1287–88 (11th Cir. 2020)).  Neither the Eighth Amendment nor, by extension, the Fourteenth Amendment requires prisoners' medical care to be "perfect, the best obtainable, or even very good"; rather, medical care violates the Constitution if it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hoffer*, 973 F.3d at 1271 (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1505, 1510 (11th Cir. 1991)).  When a prisoner receives at least some medical attention, courts generally are reluctant to second-guess medical judgment. *Hoffer*, 973 F.3d at 1272 (citing *Harris*, 941 F.2d at 1507).  But the Eleventh Circuit has "repeatedly condemned" the conduct of individuals who outright ignore prisoners' medical needs. *Hoffer*, 973 F.3d at 1272 (citing *Taylor v. Hughes*, 920

F.3d 729, 734 (11th Cir. 2019)).  "[M]edical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference."  *Dang*, 871 F.3d at 1280 (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)).

The defendants contend that Mr. Martinson has not adequately alleged an objectively serious medical need.  (Doc. 28, p. 8); *see Burnette v. Taylor*, 533 F.3d 1325, 1333 (11th Cir. 2008) ("The Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol.") (citing *Grayson v. Ross*, 454 F.3d 802, 809–10 (8th Cir. 2006); *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001); *Estate of Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994)).  At this stage of litigation, viewing the factual allegations in Mr. Martinson's amended complaint in the light most favorable to him, the Court disagrees.  As noted, a medical need is objectively serious if it is one that even a lay person would easily recognize as calling for a doctor's attention and "one that, if left unattended, poses a substantial risk of serious harm."  *Hoffer*, 973 F.3d at 1270.  Mr. Bishop's intake form documented his recent ingestion of "dangerous levels of drugs and/or alcohol," and Mr. Bishop reported his use of a dangerous level of methamphetamine to two nurses.  (Doc. 17-1, pp. 4–5, ¶¶ 23, 25, 29).  Ingestion of dangerous levels of drugs, if left unattended, may pose a substantial risk of serious harm including overdose and death; a lay person knows that.

Moreover, by 2 a.m., approximately ten hours after his arrest, when a nurse saw Mr. Bishop, he was "having difficulty breathing, had a rapid heart and respiration rate, was not steady on his feet, had slurred speech, was confused, was extremely drowsy, and was so slow to respond to questions and stimuli that he appeared to be on the verge of losing consciousness." (Doc. 17-1, p. 5, ¶ 31). By 7:30 a.m., Mr. Bishop had lost consciousness and was unresponsive. A lay person observing these symptoms would recognize that something was physically wrong with Mr. Bishop and that he needed medical attention. As the Eleventh Circuit has stated, "even to a layperson, unconsciousness alone should serve as a strong indicator of the need for immediate medical attention, at least where—as here—context doesn't indicate a benign explanation." *Patel*, 969 F.3d at 1189. Failure to seek medical treatment under these circumstances poses a substantial risk of serious harm.

To proceed with his deliberate indifference claim, Mr. Martinson also must allege facts which indicate that the nurses had subjective knowledge of the risk of serious harm, disregarded that risk, and acted with more than gross negligence. According to the complaint, each of the defendant nurses was aware that Mr. Bishop had ingested a dangerously large amount of methamphetamine. (Doc. 17-1, pp. 4–6, ¶¶ 24–25, 29, 35, 43). According to the complaint, the nurses "were aware, from their training and experience as correctional nurses, that, due to the risk of death, a

person who has ingested a large quantity of meth requires evaluation and treatment at a hospital even without accompanying signs and symptoms." (Doc. 17-1, pp. 4–7, ¶¶ 26, 32, 41, 44). Except for the intake nurse, Ms. Connell, the six other nurse defendants allegedly knew that Mr. Bishop was exhibiting physical symptoms consistent with an overdose, yet the nurses provided no medical care to Mr. Bishop. (Doc. 17-1, pp. 5–6, ¶¶ 30–31, 36–38, 43). This alleged "total inaction" in the face of a serious medical need constitutes deliberate indifference. *Patel*, 969 F.3d at 1190.

*Alabama Medical Liability Act*

SHP and the nurses argue that the first amended complaint does not meet the heightened pleading standard that the Alabama Medical Liability Act demands. (Doc. 28, p. 11). The AMLA provides:

> The plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff and shall include when feasible and ascertainable the date, time, and place of the act or acts. . . . Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief may be granted.

ALA. CODE § 6-5-551. The Alabama Supreme Court has expanded upon the pleading requirements of the AMLA:

> [W]hen a plaintiff files a complaint alleging that a health care provider breached the standard of care owed to the plaintiff, although every element of the cause of action need not be stated with particularity, the

> plaintiff must give the defendant health care provider fair notice of the allegedly negligent act and must identify the time and place it occurred and the resulting harm. If the complaint affords the defendant health care provider fair notice of these essential elements, the courts should strive to find that the complaint includes the necessary "detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff." Section 6–5–551; see *Comments*, Rule 9[, Ala. R. Civ. P.]; see, e.g., *Keller v. Security Federal Savings & Loan Ass'n*, 555 So. 2d 151 (Ala. 1989); *Kabel v. Brady*, 519 So. 2d 912 (Ala. 1987).

*Mikkelsen v. Salama*, 619 So. 2d 1382, 1384 (Ala. 1993). A plaintiff must state the negligent act, the time and place the alleged negligent act occurred, and the resulting harm. *Mikkelsen*, 619 So. 2d at 1384.

Here, the defendants have fair notice of the essential elements of an AMLA claim. Mr. Martinson alleges that the defendant nurses "fail[ed] to properly assess and treat Bishop's condition and fail[ed] to promptly send Bishop to the hospital." (Doc. 17-1, p. 9, ¶ 58). Because the nurses were acting within the scope of their employment, Mr. Martinson contends that SHP is liable under agency principles. (Doc. 17-1, p. 9, ¶ 60). The acts of negligence allegedly occurred at 8 p.m. on August 21, 2019; 2:00 a.m. on August 22, 2019; 7:30 a.m. on August 22, 2019; and between 7:30 a.m. and the afternoon of August 22, 2019. (Doc. 17-1, pp. 4–6, ¶¶ 25, 28, 34, 43). The resulting harm to Mr. Bishop was that "[a]s a result of the conduct of defendants, Bishop drowned in his own vomit and died in his cell. . . . The failure to send Bishop to the hospital despite his obvious need for emergency medical treatment was the direct cause of Bishop's death. Had Bishop been sent to the

hospital, his overdose was easily treatable." (Doc. 17-1, pp. 7–8, ¶¶ 50, 52–53). Consequently, pursuant to the requirements of the AMLA, the defendants are on notice of the alleged acts of negligence, the time and place they occurred, and the resulting harm.

## CONCLUSION

For the reasons stated above, the Court denies the medical providers' motion to dismiss Mr. Martinson's claims for deliberate indifference and medical negligence. (Doc. 27).

**DONE** and **ORDERED** this June 14, 2022.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE